Dexter Austin was indicted for assault in the second degree in violation of § 13A-6-21(a)(2), Code of Alabama 1975, as amended. The jury found the appellant "guilty as charged in the indictment." The trial judge sentenced the appellant to one year and one day in the state penitentiary, suspended, and fined him $750.00. The judge also ordered him to pay $25.00 to the Alabama Crime Victims Compensation Fund and ordered him to pay restitution to the victim in the amount of $2,578.00.
On July 24, 1988, Brenda Perryman called the appellant on the telephone. She told the appellant that she needed to speak *Page 326 
with him about his wife and her husband. The appellant agreed to meet Brenda at his shop in Phenix City, Alabama.
At the shop, Brenda told the appellant that she tapped her phone because she suspected that her husband, James Perryman, was having an affair with another woman. By tapping the phone, she taped a conversation between her husband and another woman. She told the appellant that she thought the woman's voice on the tape might be his wife's voice. The appellant listened to the tape and confirmed that the woman's voice on the tape belonged to his wife. The appellant testified that, when he heard the tape, he felt both hurt and angry.
The following afternoon, July 25, 1988, Brenda telephoned the appellant at his shop. She told the appellant that James came by her house. James told her that he knew that she had told the appellant that he had had an affair with the appellant's wife, Linda Austin. Brenda stated that James threatened her and said that the appellant's wife was a "fat pig" and looked like a "linebacker." James also admitted to having an affair with Linda for almost a year-and-a-half.
The appellant left his shop, accompanied by his son, and went to Brenda's home. Brenda said that she was afraid of James and was going to leave home. Brenda told the appellant that James was probably at his mobile home at a nearby trailer park.
The appellant and his son left Brenda's home and went towards James's home. The appellant testified that he was going there to tell James to stay away from his wife.
The appellant and his son parked their car in James's neighbor's yard. A barbed wire fence separated the two yards.
The appellant and James began arguing across the fence. James said, "I can't fight both of you, I'll fight one of you." The appellant responded, "okay, come on, . . . me and you will fight." (R. 28.)
James testified that he crossed the fence, but his neighbor told them to get out of her yard. The appellant stated that James picked up a two-by-four (2 X 4) board and crossed the fence, but that, when he moved toward James, James went back across the fence into his own yard.
The appellant then crossed the fence into James's yard. James stated that he picked up a 2 X 4. He testified that the appellant pulled out a pocket knife at first and then he also picked up a 2 X 4. According to James, the appellant started swinging the 2 X 4 at him, while he used his 2 X 4 to block the appellant's blows.
The appellant's version was that he crossed the fence and that he and James "scuffled." The appellant stated that, in the process, James dropped the 2 X 4 and took off running. The appellant then picked up the 2 X 4 and chased James.
James turned the corner of his mobile home with the appellant close behind him. James ran into a neighbor's, Ronnie Hodge's, car, allegedly because he was hit from behind by the appellant. The appellant stated that James did run into the car, but that he did so because of his own momentum and not because he was hit by the appellant.
The appellant admitted to hitting James two or three times in the arm with the 2 x 4. Hodge, who was sitting on his front porch, witnessed the altercation. He ran out to where the two men were fighting and told the appellant to stop hitting James. The appellant told him to stay out of it, since this matter was no concern of his.
Hodge told the men that somebody was going to pay for the dent in his car. The appellant responded that James would pay, and the appellant ordered James to give Hodge the money in his wallet. James took the $22.00 which was in his wallet and paid it to Hodge. After he did this, the appellant struck James in the back of the head with the 2 x 4.
James then started walking towards his truck. He got in his truck and started to drive, allegedly en route to the hospital. James claimed that he was in so much pain that he decided to stop at his wife's home, which was on the way to town, and ask her if she would drive him to the hospital. *Page 327 
The appellant, who was in his car behind James, saw James turn into the driveway where James's wife lived. The appellant stated that he feared that James would try to harm his wife, Brenda. The appellant jumped out of his car and went over to where James and Brenda were standing. Brenda testified that James had a look in his eyes which she had seen before. She claimed that she was afraid James would try to hurt her.
The appellant stated that James made a move toward Brenda, and he hit James in the face with his fist. This blow knocked James to the ground. The appellant told James that he should beg Brenda for forgiveness. The appellant stated that James made a move toward Brenda, who was standing behind the appellant, and the appellant kicked James in the face and neck area.
James testified that he got back into his truck and drove to Brenda's mother's house, which was 300 yards from the hospital. He claims he stopped there to ask if she would take him to the hospital or call his parents. James then drove four miles back to his home. He claimed that he was afraid his truck would run out of gas, and he wanted to call his parents to have them meet him at the hospital. He got into his car and drove back to the hospital.
Dr. Norman Luton, Sr., of Cobb Hospital in Phenix City, Alabama, examined James. James was admitted to the hospital for over five days. Dr. Luton testified that James had bruises, contusions, and lacerations to the body and the head, and that he suffered three fractured ribs.
 I
The appellant contends that his motion for judgment of acquittal and motion to exclude the State's evidence at the close of the State's case-in-chief should have been granted by the trial judge.
The indictment upon which this appellant was tried alleged that this appellant caused physical injury to James Perryman with a "deadly weapon or a dangerous instrument, to wit: a length of lumber. . . . " (R. 192.) The corresponding Code section is § 13A-6-21(a)(2), Code of Alabama 1975, which reads as follows:
 "(a) A person commits the crime of assault in the second degree if:
". . . .
 (2) With intent to cause physical injury to another person, he causes physical injury to any person by means of a deadly weapon or a dangerous instrument. . . . "
For this appellant's conviction to stand, there must be sufficient evidence to establish that the victim's "physical injuries" were caused by this appellant's hitting this victim with a "length of lumber," i.e., the 2 X 4. The appellant's primary argument both at trial and now on appeal is that there are at least three other possibilities that could have caused the victim's injuries: (1) he could have broken his ribs when he ran into Hodge's car, allegedly unassisted by this appellant; (2) he could have been injured by the appellant's son, who hit the victim with his fist at least once and possibly kicked the victim more than once while the victim was on the ground; or (3) he could have been injured when he was kicked by the appellant, and not by the appellant's hitting the victim with the 2 X 4. "Physical injury," in the context of this case, is "[i]mpairment of physical condition or substantial pain." Ala. Code § 13A-1-2(8) (1975).
Therefore, the physical injury here would encompass not only James's three fractured ribs but also the bruises, contusions, and lacerations, which all required medical attention. SeeDixon v. State, 57 Ala. App. 30, 325 So.2d 546 (1975), cert.denied, 295 Ala. 399, 325 So.2d 551 (1976).
The "deadly weapon" or "dangerous instrument" in this case, in accord with the indictment, would be the 2 X 4 board, which appellant admittedly used to hit the victim in the arm and head on two or three occasions. We have stated before that an item may become a dangerous instrument or a deadly weapon depending on the manner in which the item is used. Davis v. State,470 So.2d 1340, 1341-42 (Ala.Crim.App. 1985) (use of a stick or tree limb); *Page 328 Helton v. State, 372 So.2d 390, 393 (Ala.Crim.App. 1979). We find that a piece of lumber, when used to hit another in the head and body, constitutes a dangerous instrument. See Ala. Code § 13A-1-2(12) (1975).
Therefore, the only element remaining is whether this appellant intended to cause the victim's injuries. "A person acts intentionally with respect to a result or to conduct . . . when his purpose is to cause that result or to engage in that conduct." Ala. Code § 13A-2-2(1) (1975). For there to be intent, "there must be knowledge of danger accompanied with a design or purpose to inflict injury" by the act done. Commentary, Ala. Code § 13A-2-2 (1975). Moreover, the question of intent is one for the jury. Loper v. State, 469 So.2d 707, 710
(Ala.Crim.App. 1985).
In reviewing the evidence most favorably to the State,Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978), cert.denied, 368 So.2d 877 (Ala. 1979), the jury could have reasonably and fairly inferred, beyond a reasonable doubt, that this appellant (1) intended to injure the victim (2) by hitting him with a "length of lumber," and (3) that the victim's injuries were caused by those acts. See Howell v. State,431 So.2d 1326, 1328 (Ala.Crim.App. 1982), rev'd on othergrounds, 431 So.2d 1328 (Ala. 1983); Crumpton v. State,402 So.2d 1081, 1085 (Ala.Crim.App.), cert. denied,402 So.2d 1088 (Ala. 1981); Nobis v. State, 401 So.2d 191, 198
(Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala. 1981).
We therefore hold that there was sufficient evidence to present to the jury. The refusal of the trial judge to grant the appellant's motions was not error. See Cole v. State,443 So.2d 1386, 1390-91 (Ala.Crim.App. 1983) (where evidence supports verdict, no error when trial judge refuses to grant motion for acquittal); Willis v. State, 447 So.2d 199, 201
(Ala.Crim.App. 1983) (where evidence is conflicting, jury verdict not subject to review if State proves a prima facie case).
 II
The appellant next contends that the trial court committed reversible error when it granted the State's motion for an affirmative charge. The crux of appellant's argument is that the facts surrounding this case were in dispute.
Specifically, this appellant objected to the affirmative charge, since, he argued, the jury could have reasonably and fairly inferred from the evidence that the appellant did not intend to cause the victim physical injury. He claimed that the jury could find that the appellant acted in self-defense. The trial court disagreed and overruled the objection. (R. 158-65.)
The relevant portion of the trial judge's instruction to the jury was as follows:
 "Now, if you believe the evidence in this case beyond a reasonable doubt, you must find the Defendant guilty as charged in the indictment. There are two possible verdicts, either guilty as charged or not guilty."
(R. 175.)
Whenever there is any conflict in the facts, no matter how conclusive the evidence may seem, it is error for the trial judge to give a general affirmative charge to the jury. Harrisv. State, 412 So.2d 1278, 1280 (Ala.Crim.App. 1982). See also
Ala. Code § 12-16-11 (1975). Such a charge should rarely, if ever, be given, for it tends to imply that the State's evidence should be given more weight and credence than the defendant's evidence.
But the error in giving an affirmative charge is not reversible if the charge, as a whole, correctly states the law as it pertains to that cause. Harris, 412 So.2d at 1281, and cases cited therein.
Before the trial judge gave the affirmative charge, he meticulously explained to the jury that the State had the burden of proving all of the elements of assault in the second degree. He explained to the jury, in detail, what "reasonable doubt" is, and that, if they had reasonable doubt as to the appellant's guilt, then they must find the appellant not guilty. (R. 169-72.) Furthermore, the trial judge instructed the jury as follows: *Page 329 
 "Your verdict must be unanimous. It has to be the verdict of all 12 of you. You are the sole judges as to the weight that should be given to the evidence and what the verdict should be. My duty is to decide questions of law. It is your duty to determine the facts and the verdict. I have no opinion as to the facts or the verdict, and you should not take anything that I've said in this charge or any ruling that I have made one way or the other about the facts."
(R. 172.) The trial judge, immediately after giving the affirmative charge, explained to the jurors that, in accord with the possible verdicts, they could find the appellant guilty or not guilty of the crime for which he was charged, based on their findings from the evidence. (R. 175-76.)
Therefore, we hold now as we did in Harris, 412 So.2d at 1281:
 "Looking to the entire oral charge, we find that the objectionable character of the portion objected to was cured and that the objection advanced on appeal is not well taken. The misleading quality of the court's instruction is self-correcting when considered in the context of the entire oral charge when the charge is considered as a whole and when each instruction is considered in connection with the others. We think it a reasonable assumption that the jury took a common sense view of the instructions and gave to them their plainly apparent meaning."
See also White v. State, 539 So.2d 445, 446-47 (Ala.Crim.App. 1988) (no error based on reasonable doubt instruction); Brownv. State, 401 So.2d 213, 216 (Ala.Crim.App.), cert. denied,401 So.2d 218 (Ala. 1981) (harmless error based on other parts of judge's charge).
 III
The appellant raises two other issues on appeal. He claims that the trial court erred by refusing to allow him to show the victim's past reputation for violence. The purpose of this evidence, according to this appellant, was to show that the appellant acted in self-defense.
The appellant also claims that the trial court erred by refusing to give his requested instruction on self-defense. These two issues are related and thus will be discussed together.
To be entitled to a jury charge on self-defense, there must be some evidence tending to show that the appellant was justified by his actions. In this regard, we have stated:
 " 'To justify conduct through a claim of self defense, the accused must neither provoke nor encourage the difficulty. . . . Additionally, some form of retreat is required to establish a claim of self defense.' Finchum v. State, 461 So.2d 37, 39 (Ala.Cr.App. 1984) (citations omitted). '[O]ne who claims justification in the use of force must not have brought on the necessity of using it; he must have been entirely free from fault.' Commentary to Alabama Code 1975, § 13A-3-23."
Weaver v. State, 500 So.2d 1278, 1279 (Ala.Cr.App. 1986).
It is obvious in the case at bar that this appellant was not "entirely free from fault." As the trial judge stated, the appellant was the initial aggressor. He went to the victim's home where the initial confrontation occurred. If the fight had started when the victim crossed the fence to fight the appellant, an argument could have been made that the victim was the initial aggressor. But the facts reveal that the victim went back across the fence into his own yard. The appellant followed him, and a fight ensued.
The appellant had ample opportunity to leave before a blow was ever thrown. Additionally, once the fight began, the victim started running away from the appellant. Instead of abandoning the battle, the appellant pursued the victim and struck him in the body and head several times with a 2 X 4. See Ala. Code §13A-3-23 (1975); Cooper v. State, 55 Ala. App. 562,317 So.2d 529, cert. denied, 294 Ala. 755, 317 So.2d 531 (1975).
A second fight occurred a few minutes after the first altercation ceased at the victim's wife's home. While the appellant testified that he thought the victim was *Page 330 
trying to harm his wife, this confrontation still did not entitle this appellant to a jury instruction on self-defense. The second fight was merely a continuation of the first.
Since the appellant was not without fault in the first fight, he cannot claim that his conduct was a valid defense of a third person, where the latter fight was no more than a continuation of the first. Furthermore, the appellant failed to present the trial court with a written requested jury charge on defense of third person. A.R.Cr.P. Temp 14.
Since the evidence fails to support a claim of self-defense, it was not error for the trial court to refuse to allow the appellant to ask the victim's wife if the victim had a reputation for violence in the community. Williams v. State,531 So.2d 49, 51 (Ala.Crim.App. 1988); Smith v. State,466 So.2d 1026, 1031 (Ala.Crim.App. 1985). Further, the appellant's contention is diluted somewhat by the evidence that was disclosed at trial. The victim's wife testified that the victim had beat her in the past, and that she feared for her life. The effect of this testimony, practically speaking, is more descriptive of the victim's character than if the victim's wife had been able to say that the victim had a bad reputation for violence in the community.
Therefore, the decision of the trial judge to refuse to instruct the jury on self-defense and his refusal to allow testimony of the victim's propensity for violence were not error.
The decision of the trial court is due to be, and the same is hereby, affirmed.
AFFIRMED.
All the Judges concur.